# ENGLE v. UNITED STATES.

EVIDENCE; FALSE PRETENSES; WHAT CONSTITUTES.

1. In a criminal prosecution for having obtained money from the complaining witness by false representations as to a new electric battery, a statement as to its possibilities by one of the defendant's employees during a demonstration of the battery at the factory, not made in the presence or hearing of the defendant, or by his authority, is hearsay, and therefore inadmissible.

2. An inventor who, by representations as to what his invention could accomplish, induces the investment of money therein by one who has seen the invention and examined the reports of experts, is not guilty of having obtained money by false pretenses, where he never stated that it had done the things claimed, and the investor paid his money without waiting for the report of a government test which he knew was about to be made.

No. 3208.   Submitted January 6, 1919.   Decided March 31, 1919.

HEARING on an appeal from a judgment of the Supreme Court of the District of Columbia, on verdict, in a criminal prosecution for having obtained money by false pretenses.

*Reversed.*

The Court in the opinion stated the facts as follows:

Appellant George S. Engle appeals from a conviction in the supreme court of the District of Columbia upon an indictment charging him with having obtained money by false pretenses from the complaining witnesses, John A. Nicol and Mary B. Nicol.

The representations relied upon by the government are that defendant falsely pretended and represented to the Nicols that an electric battery, known as the "Engle primary battery," was perfected and capable of competing with dynamos producing and furnishing stationary power, light, and heat; that it was

cheaper to operate than any other known electric battery; that it was self-regenerating, and would recuperate when at rest, and that it was capable of heating and lighting buildings at about 10 per cent of the cost of heating and lighting the same by fuel. It is also charged that defendant made these statements to the Nicols; that the statements were false; that he knew they were false, and that, relying upon these statements, the Nicols gave a check for $500, which was subsequently cashed by defendant.

It appears that, prior to the date of giving the check (January 17, 1914), defendant had applied for a patent on the battery in question, and had organized a corporation called the American Elementary Electric Company, with large capital stock, to manufacture and dispose of the batteries. The Nicols were engaged in the brokerage business, and especially in floating enterprises of this sort, and, as early as August, 1913, they attended demonstrations of the battery, both in defendant's room at his hotel and at his factory in this city. A battery was constructed in the factory and operated under circumstances where it could be studied in every particular. Defendant gave demonstrations and lectures in which the invention was explained in detail. In September, 1913, the Nicols became sufficiently interested that they took an option contract for the sale of stock in the corporation, and in October they began investing in it themselves, the check in question being the last of a series of payments made under this arrangement.

Experts were brought here from various parts of the United States to examine the invention. In November, 1913, electrical experts from Illinois and Wisconsin came to Washington to make a test of the battery. When they arrived, defendant took them into the laboratory and said: "There are the cells, and there is the material, and you can put up your cells, and you can kill it if you can." Calkins, one of the experts, "put it all together, and defendant did not touch anything. * * * At the end of five hours he (Calkins) said: 'We might as well go to supper now, because the cells are not dead, and if I could kill it at all, I could kill it in the first hour.'" The following day,

Loring, another expert, arrived, and another test was made, described by Richardson, a member of the western party, as follows: "The Nicols were not present when Calkins made his test; when Loring made his test, Calkins was present.   Outside of the Nicols and his party that came from the west, Calder came during the time of this test, and Normandy and Montague and the employees that were there in the factory were present, and other people came in on Sunday there from different states, —quite a number of people.   This test was made in the open, everybody saw it; defendant only sat around and looked on, or sat around and smoked a cigar.   Respecting the results of the test, Calkins apologized to witness for what he had said on the train, saying, 'I have been whipped.'   Witness had quite a long talk with Loring, who was well satisfied, and witness told Loring he, witness, would expect to put in more money, and wanted his honest opinion, and Loring gave it to him.   Witness thinks that Loring spoke so that any one could hear it, that it was in hearing distance; witness heard it, and defendant was present on each occasion all the time.   This was just before Thanksgiving, 1913.   All were well pleased; we had our picture taken together over it, in celebration."

Calkins in his report concluded: "I wish to state that in my opinion this primary cell, in its crude form as given to me, is far superior to any other primary cell on the market, but at present it remains to be found by experiment whether we can apply the cell to heavy work."   Loring in his report concluded: "I wish to state that the batteries used in the test were built in the factory in my presence, and represent the present state of development.   Observation also revealed the fact that much studying and experimentation was being carried on by the technical corps, with the idea of perfecting the battery for various industrial purposes."   Subsequently, a test was arranged to be conducted by the Bureau of Standards, but before a report had been received from this test, the Nicols had given the check in question.

John A. Nicol, whose "business is that of a broker," testified that he "entered into the exploitation of the battery with zest,

and enlisted his friends with him, because he was convinced that it had a great future, and that it would be a great enterprise. He cannot recall that defendant ever claimed any special knowledge on the subject, beyond what the others who came there and saw the battery claimed; he believed that the action of the zinc and chemicals is what produced the electric current. The falsity of the statement about the battery was that it could produce power, light, and heat in competition with dynamic current, a claim that this was a battery that was perfect, that it would produce power, light, and heat in competition with a dynamic current, and the way he was going to enlarge on it was by increasing the number of cells and putting them together by means of which he would remove the internal resistance. He did not tell what chemicals he used; he said that was a secret that he had."

Mary B. Nicol also testified that "she was shown various performances of the battery, but did not know anything about it, they claimed that it showed something, and she took their word for it. She had no reason not to believe them, she did not consider she was smart enough to say that it could not be done, and defendant told her that other people, that smart electricians, had given him their statements that it could be done, and he had letters from a Mr. Williams and from Mr. Calder, and people he claimed stood very high; she knew nothing about them. She and her husband did not pay any money for themselves until about the middle of October, 1913. The last payment was the one that was due on January 17, 1914. Before giving the check of $500 of that date, she had been hearing about a test by the Bureau of Standards, and what big things they were going to prove by it; this she heard from everybody around the factory and the office, and she talked with defendant about it very often."

*Mr. Henry E. Davis* and *Mr. Alvin L. Newmyer,* for the appellant, in their brief cited:

*American School &c.* v. *McAnnulty,* 287 U. S. 94; *Austin* v. *People,* 63 Ill. App. 303; *Biddle* v. *United States,* 84 C. C. A. 415; 2 Bishop, New Crim. Law, §§ 424 et seq. 429; *Bishop* v.

*Small,* 63 Me. 12; *Clarke* v. *People,* 53 Colo. 214; *Com.* v. *Wood,* 142 Mass. 459; *Crocker* v. *Manley,* 164 Ill. 282; *Curtis* v. *State,* 88 S. W. 236; 9 Decen. Dig. p. 964, col. 1, § 7; *Derrington* v. *Poplar Bluff,* — Mo. —, 186 S. W. 561; *Dillman* v. *Nadlehoffer,* 119 Ill. 567; *El Paso etc. Co.* v. *Foth,* 101 Tex. 133; *El Paso etc. Co.* v. *Bolgiano,* — Tex. —, 109 S. W. 388; *Estep* v. *Larsh,* 21 Ind. 190; *Ft. Worth Co.* v. *Jones,* — Tex. —, 166 S. W. 415; *Greenough,* 31 Vt. 279; *Greenwald* v. *New York C. etc. Co.* 159 N. Y. Supp. 15; *Hide & Leather Splitting Co.* v. *Tool Co.* Holmes, 503; *Holton* v. *State,* 109 Ga. 127; *Hunt* v. *Douglass Twp.* 165 Mich. 187; *Hunter* v. *McLaughlin,* 43 Ind. 38; *Kimball* v. *Bangs,* 144 Mass. 321, 11 N. E. 113; *Jackson* v. *People,* 126 Ill. 139; *Jules* v. *State,* 85 Md. 305; 35 L.R.A. 435 note; *Marshall* v. *Peck,* 1 Dana, 611; *Maxwell* v. *C. & E. I. R. Co.* 140 Ill. App. 156; *Metropolitan R. Co.* v. *Johnson,* 90 Ga. 500; *Miller* v. *State,* 99 Ga. 207; *Mooney* v. *Miller,* 102 Mass. 217; *Niedefer* v. *Chastain,* 71 Ind. 262; *Parks* v. *State,* 94 Ga. 601; *Partridge* v. *United States,* 39 App. D. C. 571; *People* v. *Arberry,* 13 Cal. App. 749; *People* v. *Gibbs,* 98 Cal. 661; *People* v. *Jacobs,* 35 Mich. 36; *People* v. *Majorana,* 155 App. Div. 431; *People* v. *Peckens,* 153 N. Y. 576; *Pickford* v. *Talbott,* 28 App. D. C. 498, 211 U. S. 199; *Rockafellow* v. *Baker,* 41 Pa. 319; *Snowden* v. *Waterman,* 105 Ga. 384; *State* v. *Fooks,* 65 Iowa, 196, 21 N. W. 561; *State* v. *Hefner,* 84 N. C. 751; *State* v. *Holmes,* 82 N. C. 607; *State* v. *Marion,* 235 Mo. 359; *State* v. *Paul,* 69 Me. 215; *Steele Co.* v. *Dover,* — Tex. —, 170 S. W. 809; *Stephens* v. *Eldorado Springs,* 185 Mo. App. 464; *Texas Midland R. Co.* v. *McKissack,* — Tex. —, 152 S. W. 815; *Tuck* v. *Downing,* 76 Ill. 92; *Walker* v. *State,* 67 So. 94; *Waniorek* v. *U. R. R.* — Cal. —, 118 Pac. 947; *Western Coal etc. Co.* v. *Buchanan,* 82 Ark. 499; *Western Coal etc. Co.* v. *Moore,* 96 Ark. 206; 2 Whart. Crim. Law, § 1155.

*Mr. John E. Laskey,* United States Attorney, and *Mr. James B. Archer* and *Mr. Bolitha J. Laws,* assistants, for the appellee:

The indictment was not open to criticism that the allegations

did not present representations of past or existing facts as contradistinguished from opinion, things to be effected in the future, or speculations.

"Mere puffing, indeed, might not be within its meaning of the act (section 215, U. S. Penal Code, offense of using the mails to defraud by false pretenses, etc.), that is, the mere exaggeration of the qualities which the article has; but when a proposed seller goes beyond that, assigns to the article qualities which it does not possess, does not simply magnify in opinion the advantages which it has, but invents advantages and falsely asserts their existence, he transcends the limit of 'puffing' and engages in false representations and pretenses. *An article alone is not necessarily the inducement and compensation for its purpose. It is the use to which it may be put,* the purpose it may serve; and there is deception and fraud when the article is not of the character or kind represented and hence does not serve the purpose. * * *

"Indeed, if it could be admitted that the article offered for sale and its price could be balanced, the one against the other, the price necessarily would be the expression of value and would be constituted of all the attributes of the article, intrinsic and extrinsic. * * * " (Italics and parentheses ours.) *United States* v. *New South Farm & Home Co.* 241 U. S. 64, 71, 72.

Under sec. 215 of the Penal Code the "scheme and artifice" may include promises and things to be effected in the future, but this court has foreclosed any claim that the representations must be direct, definite, and positive statements of fact. *Partridge* v. *United States,* 39 App. D. C. 584.

"If the defendant had only been charged with having falsely represented to Glendy that Tomlin was unable to pay him * * * we should have before us a naked assertion, which if untrue would have been a simple lie. But when the facts upon which the assertion is made are set forth; when, as a reason in support of the statement, it was said that he was insolvent, and was largely indebted to divers persons, and was possessed of only a small estate * * * it seems to me that every fact which

would naturally have created an existing certain inability to pay so large an amount to Glendy was presented to his mind as motives for him to part with his evidences of indebtedness at an unconscionable sacrifice." *State* v. *Tomlin,* 29 N. J. L. 23.

"This is not a case for the application of the rule that mere commendation or puffing of an article is allowable to a vendor without subjecting him to the imputation of false representations. * * * The purchaser was inexperienced. The vendor knew, or at least the purchaser had a right to presume that the vendor knew, all about the powers of the machine to be constructed. The plaintiff had a right to rely upon the representations of the vendor in this case. He was compelled to do so, and the proof shows he did so. Any untrue representation made then, with respect to the capacity of the machine, or its fitness for the purposes for which it was known by the vendor to be intended, would be fraudulent if they induced the purchase. *Gaty* v. *Holcomb,* 44 Ark. 219.

"The defendant claimed to have practical knowledge upon the subject, had tested his own formulas for welding, refining, hardening, and tempering steel. * * * What the defendant said about the merit of his patent right was not a mere matter of opinion,—extravagant assertions, which could not mislead a person of ordinary intelligence, as claimed by counsel." *Page* v. *Dickerson,* 28 Wis. 700. See also *Hicks* v. *Stevens,* 124 Ill. 186.

"The general characters of a fraudulent representation which will lay a foundation for an action for deceit * * * are well settled, so far as general rules can settle any legal question. The representation must be concerning a material fact, must induce the execution of the contract, and must be made falsely. The falsity constitutes the *scienter,* which is an essential element in every fraudulent representation. This falsity may consist in making a representation of a material fact knowing it to be false, or it may consist in making a representation which is untrue without knowledge whether it is true or false, and by coupling with the representation an expressed or implied affirmation that it is known to be true of personal knowledge.

The instances in which representations can be said to be fraudulent, as they are cognizable in a court of law, are confined within the above statement." *State, Cummings* v. *Cass,* 52 N. J. L. 83. See also *Park* v. *State,* 94 Ga. 601.

"Now the pretense of power, whether moral, physical, or supernatural, made with the intent to obtain money, is within the mischief of the law, and sufficient to constitute an offense within the statute." *Reg.* v. *Giles,* 10 Cox, C. C. 48; *Com.* v. *Murphy,* 96 Ky. 28; *People* v. *Winslow,* 39 Mich. 505; *Jules* v. *State,* 85 Md. 305.

"Nor did the court err in overruling the demurrer to the amended declaration. It states facts sufficient to constitute a public offense. The statement that the young man was suffering from a valvular disease of the heart was a statement of fact. It was not given as an opinion, but it was a statement voluntarily made by defendant to a person from the country, ignorant of medicine and diseases and who had the right to rely upon a physician's honor and integrity. It is not pretended that the statement is true, etc." *People* v. *Arberry,* 13 Cal. App. 757. To the same effect: *Jackson* v. *People,* 126 Ill. 139; *Clark* v. *People,* 53 Colo. 214; *Parks* v. *State,* 94 Ga. 601.

"As a general rule, the mere expression of an opinion, which is understood to be only an opinion, does not render a person expressing it liable for fraud. But when the statements are as to value or quality, and are made by a person knowing them to be untrue, with an intent to deceive and mislead the one to whom they are made, and he is thus induced to forbear making inquiries which he otherwise would, they amount to an affirmation of fact rendering him liable therefor. In such a case, whether a representation is an expression of opinion or an affirmation of a fact is a question for the jury. The rule that no one is liable for an expression of an opinion is applicable only when the opinion stands by itself as a distinct thing. If it is given in bad faith, with knowledge of its untruthfulness, to defraud others, the person making it is liable, especially when it is as to a fact affecting quality or value and is peculiarly

within the knowledge of the person making it." *People* v. *Peckens,* 153 N. Y. 591.

"The pretense, as charged, is the false and fraudulent representation that a certain recipe in writing, combining certain articles, would produce, as a compound, a nonexplosive burning fluid and camphene of great value.    The bill negatives *in toto* the truth of the representation, and charges upon Greenough a *scienter* of its falsity, and fraud also, and that the vendee purchased the recipe for the sum paid by him as alleged in the bill, relying upon the representations of Greenough.    If the means used by Greenough constitute a false pretense, I do not understand it is claimed that this is not a case within the Illinois statute.   *   *   *   It may in truth be said that every false assertion is not a false pretense; but if it requires something to be done, by the application of tests or otherwise, to ascertain whether the representation is false, it then becomes a false pretense.   *   *   *   In this case, it was matter of experiment whether the ingredients specified in the recipe would produce as a compound 'a nonexplosive burning fluid.'   The falsity of the representation by Greenough was not to be discovered upon ocular inspection of the ingredients, but by the tests of chemical analysis, or actual experiment.   The representations to constitute a false pretense must be of an existing fact, it is true, yet it is no objection that it has relation to a future event," etc.   *Re Greenough,* 31 Vt. 290.

Mr. Justice VAN ORSDEL delivered the opinion of the Court:

Undoubtedly, defendant made exaggerated statements as to what the battery could or would accomplish.    But, in establishing a fraudulent intent, the circumstances under which the statements are made, the relation of the parties, and the ability of the parties to deal at arm's length, are important.    It is for this reason that we have detailed the evidence at length.

Coming to the assignments of error, it will be unnecessary, in our view of the case, to review them all.    Material error was committed in admitting, over the objection and exception

of defendant's counsel, the testimony of the witness Wenner, who testified that he is a physicist in the Bureau of Standards; that he witnessed a demonstration of the battery at the factory in company with a man named Canada, and that the demonstration was made by one Normandy, an employee at the factory, who stated that "the claim was made that the battery would replace the ordinary means for supplying heat and light to houses and also that it would replace the ordinary means for propelling vehicles of the automobile type, and also trains." This statement was not shown to have been made, either in the presence or hearing of defendant, or by his authority. It was, therefore, hearsay, and erroneously admitted.

We think, however, that the case falls within a broader scope. False pretense or representation within the meaning of the law must relate to some subsisting fact, past or present. A statement as to the future by way of opinion or expectation as to what can be accomplished does not constitute false pretense. Defendant never stated that the battery had accomplished the things he is alleged to have said it would. He had never heated a building nor propelled an automobile to the Pacific coast with it. Indeed, Nicol testified that he represented to him that to accomplish these things he intended to enlarge it "by increasing the number of cells and putting them together by means of which he would remove the internal resistance."

Nor do we attach great importance to the statement that it was "a perfected invention," or "a battery that was perfect." The court below stated to the jury in the charge that "this primary battery is an ordinarily good primary battery." One of the experts stated that the primary cell "is far superior to any other primary cell on the market." The Nicols examined the papers in the Patent Office, and acquainted themselves with the invention for which defendant had applied for a patent. They saw the invention; they saw what it would do; they saw the invention, so far as perfected, tested by experts; they had the reports of the experts, and they knew of the proposed Bureau of Standards test which brought discredit upon the enterprise. Notwithstanding they knew this test was being made, they paid

their money without waiting for a report. The letters of the Nicols, written to prospective purchasers of stock, as well as the lectures of defendant, contained much of what is called by the courts "dealers' talk" or "barters' talk," more properly denominated in this case as "inventor's talk" or "promoter's talk."

Considering the relation of the parties and their conduct in respect of this transaction, we deem it unnecessary to decide whether representations such as were alleged to have been made by defendant would, under any circumstances, constitute false pretense. It is sufficient to say that in this case the government has failed to establish that degree of criminal intent essential to sustain a judgment of guilt.

The judgment is reversed, and the cause is remanded for further proceedings. *Reversed and remanded.*